IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 24, 2007

## STATE OF TENNESSEE v. KRISTI DANCE OAKES

**Direct Appeal from the Circuit Court for Sevier County**
**No. 10656-II    Richard R. Vance, Judge**

**No. E2006-01795-CCA-R3-CD** - Filed September 27, 2007

The Defendant, Kristi Dance Oakes, pled guilty to one count of statutory rape. The trial court denied her request for judicial diversion or full probation and sentenced her to eighteen months, of which six months is to be served in the county jail, followed by twelve months of supervised community probation. She appeals that decision. Upon review, we affirm the judgment of the trial court, after modifying the sentence. However, we remand for the correction of a clerical error in the judgment form.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

Barry H. Valentine, Newport, Tennessee, for the Appellant, Kristi Dance Oakes.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; Steven R. Hawkins, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Facts

On June 23, 2004, an officer with the Tennessee Valley Authority Police received a complaint that a woman was screaming in a parked car located at the Douglas Dam parking lot in east Tennessee. When the officer approached the car, he found the Defendant giving oral sex to a young man in the backseat. After taking the Defendant into custody, the officer discovered that she was thirty-one years old and that the young man was sixteen years old. The officer also discovered that the Defendant had been the young man's biology teacher during the previous school year and

that they both were spending the summer working together at the NASCAR Speedpark.[1]

Subsequently, a Sevier County Grand Jury indicted the Defendant for statutory rape, a Class E felony. The Defendant filed an application for pretrial diversion, which included twenty letters written on the Defendant's behalf describing, in part, her good reputation and positive contributions as a teacher and mother.[2] After the District Attorney General denied the Defendant's application, the Defendant filed a petition for a writ of certiorari requesting that the trial court review the District Attorney General's decision. When the trial court upheld the District Attorney General's decision and denied the Defendant's oral request to appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, the Defendant filed a Rule 10 application of extraordinary appeal with this Court. After granting the Rule 10 application, this Court vacated the trial court's order and remanded the case to the District Attorney General. *State v. Kristi Dance Oakes*, No. E2005-01668-CCA-R10-CD, 2006 WL 176550, at *5 (Tenn. Crim. App., at Knoxville, Jan. 23, 2006). Specifically, this Court stated:

> Applying the rules to the prosecutor's review of the pretrial diversion petition, we find departures from the prescribed process. We find no indication in the prosecutor's response that he considered all of the mandated factors, and we note that the [D]efendant's apparently good prospects for rehabilitation, lack of a criminal record, and her excellent social history support her bid for pretrial diversion. . . . Obviously, the circumstances of the offense were paramount in the prosecutor's decision, but his response fails to articulate that he considered all of the factors supporting diversion before deciding that the circumstances of the offense overwhelmed the aggregate positive factors.

*Id.* at *4. On remand, the District Attorney General again denied pretrial diversion, and the Defendant filed her second petition for a writ of certiorari asking the trial court to review the District Attorney General's decision. Attached as exhibits to this second petition were four additional letters supporting the Defendant's character.[3] After the trial court again upheld the District Attorney

---

[1] This brief recitation of facts comes from the factual basis for the Defendant's guilty plea as presented by the State at the guilty plea proceedings on June 19, 2006.

[2] A number of different people wrote these letters on behalf of the Defendant, including her godparents, one of her cousins, several members of her church, a parent of one of her former students, her college advisor, and friends of her family. These letters were also entered as exhibits at the Defendant's sentencing hearing on July 27, 2006.

[3] The specific content of each of these letters can be summarized as follows: (1) a letter from the Defendant's therapist indicating that the Defendant had met with her on five previous occasions to discuss, in part, appropriate boundaries and paying the consequences for poor judgment and choices; (2) a reference letter from one of the Defendant's employers showcasing the Defendant's outstanding job performance; (3) a letter from an occupational therapist who praises the Defendant's abilities as a mother and urges that the Defendant's daughter, who has a variety of special needs, requires the Defendant's constant care; and (4) a letter from the Defendant's husband indicating that he and the Defendant have since reconciled, that he has "total faith in her," and that his family would suffer greatly if the Defendant were incarcerated. These letters were also considered at the Defendant's sentencing hearing. Ironically, several comments

2

General's decision, the Defendant pled guilty to one count of statutory rape. The trial court accepted the plea and the agreed upon sentence length of eighteen months.

The trial court then conducted a sentencing hearing to determine: (1) whether to grant judicial diversion or full probation; and (2) the manner of service for the Defendant's sentence. At the sentencing hearing, the trial judge heard testimony from Patricia Fletcher, the victim's mother, Tim Wagers, the officer who arrested the Defendant, and Rebecca Dance, the Defendant's mother. In addition, the following items were entered into evidence as exhibits: (1) the Defendant's pretrial diversion application and the State's responses; (2) the victim's statement; (3) the Defendant's psychosexual evaluation; and (4) the Defendant's Presentence Investigation Report.

At the sentencing hearing, Patricia Fletcher testified that she first became aware of the Defendant when she caught the victim chatting with the Defendant on the computer late one night during the school year. Fletcher stated that the victim told her that he and the Defendant were studying together. Fletcher testified further that, on the day of the incident, the victim told her that the Defendant had given him a ride to the NASCAR Speedpark the day before and would also be picking him up that evening. Fletcher stated that, when the Defendant called the victim to let him know she was waiting outside, the victim ran out the door. Fletcher went outside to speak to the Defendant, but, by the time she got there, the victim and Defendant had already left together. When the victim did not return home on time that night, she began to worry and called some of the victim's friends. She also called the number that the Defendant had called the victim from earlier because it was stored on Fletcher's caller ID, but she did not successfully reach the Defendant. Fletcher stated that, about thirty minutes later, she received a call from someone from the police department, who informed her to come down to the station. The police would not tell her what was wrong over the phone, only that the victim and the Defendant were there together. Fletcher stated that, since she arrived and found out about the incident, she has been angry and devastated. Fletcher testified that she did not even know that the Defendant had been working with the victim until Fletcher spoke with the victim the day after the incident. When asked if she had placed trust in the Defendant as a parent with regard to her son, Fletcher responded that because the Defendant was a teacher, Fletcher "had no reason not to trust her."

Fletcher further testified that the first time she ever had any contact with the Defendant was a few days after the incident. The Defendant called Fletcher to apologize for what had happened

---

in the letter from the Defendant's husband about the pervasiveness in society of teacher-student sex offenses were critical in persuading the trial court to deny judicial diversion at the sentencing hearing. The Defendant's husband, who is a teacher, said, in part:

> Issues such as those dealing with [the Defendant's] case will continue to happen until something is done about this pop-culture – "I'm In Love With Stacey's Mom" – youth. I have seen numerous occasions where much worse has been carried out in the school setting . . . . Not to downplay [the Defendant's] case, but in an effort to realize that this is a grand problem that occurs much more than we realize, we must attach the true problem as a society – our youth gaining their life styles and goals from an unmoral pop culture.

with the victim. Fletcher stated that she asked the Defendant why she did it, and the Defendant told her that she did not know. The Defendant mentioned to Fletcher that she had been having marital problems and was really concerned that she would not be able to teach again. Fletcher further testified that the Defendant kept emphasizing that she is a good teacher and seemed more concerned about her teaching prospects than about what had happened between her and the victim.

When asked whether the victim has suffered any behavioral problems as a result of this incident, Fletcher stated that the victim is now on probation and has had "a lot of problems with getting in fights and a lot of problems with girlfriends." Fletcher also stated that the victim "seems embarrassed about [the incident] . . . [be]cause kids had been taunting him about it" and that "it's just been embarrassing for the whole family."

On cross-examination, Fletcher stated that the Defendant has called the victim one time since the incident but has made no other attempts to contact him. Fletcher also stated that, during the period of time that the Defendant was the victim's teacher, Fletcher had no contact with her but had heard the victim mention her name before. When asked about the victim now, Fletcher stated that he is planning on going into the military and is "doing a lot better." Fletcher also stated that, prior to the incident, the victim "had a temper, like any kid" but "very seldom" fought with other kids. Fletcher further explained that there was no indication that the Defendant and victim had engaged in sexual relations prior to the incident. Fletcher stated, however, that she had a "bad vibe" about the rides to work and late-night computer chats between the Defendant and victim.

Officer Tim Wagers testified that on the night of the incident, June 23, 2004, he received a call to investigate a woman's screams coming from a dark-colored vehicle parked on Dike 4 at Douglas Lake in Sevier County. When he went to the area and approached the vehicle, he saw that the Defendant was topless, the victim's pants were down, and the Defendant's head was in the victim's lap. Officer Wagers said once he realized that the Defendant was performing oral sex on the victim, he broke it up and told the Defendant and victim to get dressed and step out of the vehicle. The victim then told Officer Wagers that he was sixteen years old, and the Defendant said she was thirty-one years old and was the victim's biology teacher.

When asked about what the victim told him regarding where the victim and Defendant were working that summer, Officer Wagers testified that the victim told him that the Defendant "came to work [at the NASCAR Speedpark] to be with him" and that "they would be together if it wasn't [for] the age difference." Additionally, when asked about the Defendant's demeanor directly after she was caught, Officer Wagers stated that the Defendant "never was upset" and "was cheery [and] upbeat." Officer Wagers also stated that, when he saw the Defendant at the courthouse a few days after the incident, "her demeanor and attitude was just nonchalant, not a care in the world." Officer Wagers stated that the Defendant showed no remorse or embarrassment over what he caught her doing with the victim. On cross-examination, Officer Wagers stated that, because he had never met the Defendant prior to this incident, he had no way of knowing how she normally reacts to and deals with bad situations. Officer Wagers also stated that neither the victim nor the Defendant admitted to any intimate encounters between the two of them prior to this incident.

4

Rebecca Dance testified that, since the time of this incident, she has had almost daily contact with the Defendant. Dance stated that the Defendant lived with her while growing up and again right after the Defendant got married. The Defendant and her husband helped Dance take care of Dance's husband when he was sick. Dance stated that the Defendant first started working in high school and has basically maintained continuous employment since then. Dance further testified that she never had any problems with the Defendant when the Defendant was a juvenile and knows of no problems that the Defendant has had since this incident.

Dance also testified that the Defendant has two children, ages eight and four. The eight-year-old was born an ultra-preemie and has sensory integration dysfunction. She has asthma and usually contracts pneumonia a couple of times a year. The four-year-old is in pretty good health, but has reflux and occasionally contracts bronchitis. Dance stated that the Defendant is "a wonderful mother" and that "both of the children are very, very close to her." Dance also explained that the Defendant is regarded highly in the community. She said that the Defendant "always grew up in church" and has spent her whole life volunteering for a local charity. Dance also said that the Defendant has recently done mission projects and "has always been very sensitive to other people's needs."

When asked about how the Defendant's employment has changed since the incident, Dance testified that the Defendant "lost her career" and has been "unable to get a [comparable] job." Dance stated that the Defendant was terminated from a grocery store because of the Defendant's negative portrayal in the media. Dance also stated that she thinks the Defendant only makes about $100 a week at her current restaurant job. Dance further testified that, after the Defendant and her husband lost the home they once owned due to loss of income, the Defendant moved into a trailer about 200 yards from Dance's home. Because the Defendant lost her vehicles, Dance has been providing her with transportation for the past two years. Dance further stated that she, her mother, and the Defendant's mother-in-law, have been helping the Defendant buy groceries and pay bills. Dance has never been aware of any drug usage or alcohol problems with the Defendant.

In addition to this testimony, the trial court reviewed the Defendant's pretrial diversion application and the State's responses. The application contained the reference letters discussed above and the Defendant's own recitation of the facts. The Defendant's version of the facts was more detailed than that given by Wagers during his testimony but is otherwise substantially similar. The Defendant added that other teachers and parents worked alongside students at the NASCAR Speedpark during the summer of 2004 and that she received the job through one of the parents. She also said that she spoke with Fletcher "on various occasions" prior to the incident, and Fletcher assured her that it was okay for the Defendant and victim to ride to work together. Additionally, the Defendant stated that, on the night of the incident, she had high blood pressure and was not feeling well physically. Further, when she and the victim were parked out at Douglas Lake on the night of the incident, the victim "leaned across and kissed [her]." After admitting to performing oral sex on the victim, the Defendant stated that she "terribly regret[s] what occurred and realizes[s] it should never have happened." The Defendant explained that, shortly after the incident, she voluntarily resigned from the NASCAR Speedpark and Sevier County Schools.

5

In its responses to the Defendant's pretrial diversion application, the State noted that "[the] situation of an adult female having sex with a juvenile male is an emerging phenomenon in this country that has garnered a lot of publicity both nationally as well as locally." The State mentioned another recent case in Sevier County that is like the case at bar and attached a copy of a recent newspaper article involving a similar case in Franklin, Tennessee.[4] The State also attached a statement from the principal at the high school where the Defendant taught before this incident. In the statement, the principal recounted that "sometime during the last school year, one of my custodians came to me and reported that [the Defendant] was locked in a room with a male student." He further stated that when he opened the door, "the two were far apart and talking."

The trial court also reviewed the victim's written statement about the incident. The victim explained that he had a C+ average while enrolled in the Defendant's biology class, and the Defendant "was friendly with all of the students." Though he stated that he never received extra help from the Defendant during the school year, the victim clarified that, towards the end of the school year, he and the Defendant "communicated via AOL . . . about what we were going to do this summer." The victim stated that on the night of the incident, the Defendant "started talking to me about her marriage problems." After explaining that the Defendant performed oral sex on him for about ten minutes, the victim stated that "the whole time that [the Defendant] and I worked at the Speedpark, the topic of sex never came up." Additionally, the victim said that the Defendant never asked him to lie for her.

The trial court also reviewed the Defendant's psychosexual evaluation. After analyzing the Defendant's mental status, her feelings regarding the incident with the victim, her sexual history, and all other relevant biographical information, the evaluator reported that the Defendant "has good insight in most areas of her life, though her insight about [the incident] is only fair." The evaluator also stated that the Defendant has a stable lifestyle, is strongly invested in the well-being of her children, and "can be considered a low risk for further sexual offending." The evaluator concluded that the Defendant "can be safely maintained in the community with supervision."

The trial court also reviewed the Presentence Investigation Report. In that report, the Tennessee Board of Probation and Parole stated that the Defendant has no other convictions or felony arrests and that she would be "a medium risk for successful completion of supervised community release."

After closing arguments, the trial court addressed the Defendant's application for judicial diversion by weighing all the evidence described above. The trial court stated that "the facts of this particular offense are . . . especially shocking and offensive." It placed great emphasis on the fact that, as a teacher, the Defendant held a position of trust in the community and was responsible for upholding her status as an authority figure and role model for young people. The trial court also

---

[4] This article mainly deals with a thirty-seven-year-old woman who admitted to having sex with a sixteen-year-old boy and was subsequently sentenced to 117 days in jail and one year of probation. It also states that there has been "an increase in cases of women having sex with teenage boys."

emphasized that the relationship between a teacher and student "must be a positive and appropriate one." The court felt that the Defendant has not shown a significant amount of remorse for her actions. Her main concerns have been about the consequences to her and her family. She has not taken enough time to consider that "[the victim] was held up to ridicule" as a result of this incident. The trial court also stated that deterrence is a "very important factor" in the judicial diversion analysis. The court paid particular attention to the State's evidence of similar cases, including the newspaper article and the statements made by the Defendant's husband in his letter about the pervasiveness of this type of incident in schools, and concluded that these types of sexual offenses are "a serious problem in our society." Determining that punishment is warranted in this case, the trial court found that the factors against judicial diversion outweighed the factors for it. Accordingly, the trial court denied the Defendant's request for judicial diversion.

In considering whether to grant the Defendant full probation, the trial court explained that it is required to look at the same general factors as it does for judicial diversion. The court stated that the Defendant's "particularly shocking" actions in this case were not the result of "a momentary lapse of judgment, but the result of a continuing inappropriate relationship." Even though the Defendant lost her teaching career and experienced tremendous financial hardship because of her actions, the trial court decided that the victim's extensive suffering outweighs these setbacks. The court considered all the evidence suggesting that the Defendant is a viable candidate for alternative sentencing, including the findings in the psychosexual report, presentence investigation, and referral letters written on her behalf, but found that "[p]unishment is important as a deterrent to others who might find themselves similarly tempted." The court also considered the mitigating factors that the "Defendant's conduct neither caused nor threatened . . . serious bodily injury" and that she has received counseling, but it stated that both the duration of the improper relationship and the regular daily contact between the Defendant and victim leads the court to believe that "this inappropriate conduct would have continued . . . had the police not intervened." As a result, the trial court denied full probation and sentenced the Defendant to eighteen months, of which six months is to be served in the county jail, followed by twelve months of supervised community probation.[5] The Defendant filed a timely notice of appeal to this Court on August 28, 2006.

## II. Analysis

On appeal, the Defendant alleges the following: (1) the trial court abused its discretion in denying her request for judicial diversion; (2) the trial court erred in denying her alternative request for full probation and sentencing her to eighteen months, of which six months is to be served in the county jail, followed by twelve months of supervised community probation; and (3) the trial court illegally sentenced her to community supervision for life following the expiration of her sentence.

---

[5] The court also ordered the Defendant to "register as a sex offender . . . ; comply with the sexual offender directives; produce a DNA sample . . . ; maintain full-time employment; pay court costs; [and] follow a plan of counseling approved by her probation officer."

## A. Judicial Diversion

The Defendant argues that the trial court erred in denying judicial diversion because it failed to properly weigh all the factors that courts must consider in reviewing a petition for judicial diversion. When a defendant challenges the denial of judicial diversion, we review the trial court's decision under an abuse of discretion standard. *State v. Cutshaw*, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). We must conclude that "no substantial evidence exists to support the ruling of the trial court" if we are to grant the Defendant relief. *Id.*

Judicial diversion falls under Tennessee Code Annotated section 40-35-313(a)(1)(A), pursuant to which a judge can defer proceedings without entering a judgment of guilty. The defendant would be placed on probation, but she would not be considered a convicted felon. T.C.A. § 40-35-313(a)(1)(A) (2006). To be eligible for judicial diversion, a defendant must have pled guilty to, or been found guilty of, a Class C, D, or E felony and must have not previously been found guilty of a felony or Class A misdemeanor. T.C.A. § 40-35-313(a)(1)(B)(I). In the case under submission, the trial court found that the Defendant was eligible for judicial diversion based on these requirements. However, eligibility in and of itself does not entitle a defendant to judicial diversion. *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000).

Once a defendant is deemed to be eligible for judicial diversion, the trial court must consider several factors when deciding whether or not to grant judicial diversion. Due to the similarities between pretrial diversion — determined initially by the District Attorney General — and judicial diversion, courts draw heavily from pretrial diversion law and examine the same factors:

> [A court] should consider the defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation and amenability to correction, as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that [judicial] diversion will serve the ends of justice and best interests of both the public and the defendant.

*Cutshaw*, 967 S.W.2d at 343-44. Additionally, "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." *Id.* (citing *Bonestel*, 871 S.W.2d at 168).

We initially note that all parties are in agreement, and the presentence report indicates, that the Defendant has never been convicted of a Class A misdemeanor or any other felony. Thus, she is eligible for judicial diversion. Next, in analyzing whether to grant judicial diversion, the trial court found that a number of factors weighed against judicial diversion. First, the trial court focused on the circumstances of the offense and concluded that the nature of this teacher-student relationship

8

was highly inappropriate, especially because the evidence showed that the Defendant engaged in late-night internet communications with the victim throughout the school year and then went to work at the same place as the victim immediately after the school year ended. The court further stated that, in light of the Defendant's role as an educator in society, it is "especially shocking and offensive" that "a 31-year-old teacher would engage in sexual conduct with her barely-16-year-old student." Next, the court felt that the Defendant was not amenable to correction primarily because she had not been mindful enough of the consequences of her actions to the victim and instead focused too much on how this had impacted her. Finally, in looking at all the evidence presented, the court decided that the need for deterrence was too great to ignore. Evidence on this issue came from a letter from the Defendant's husband, as well as a newspaper article attached to the State's response to the Defendant's pretrial diversion application. The court stressed that "[this kind of conduct] leads to grave consequences for the student, for the teacher, [and] for the trust and confidence . . . in our educational system." Though the court did not specifically discuss each factor that weighed in favor of judicial diversion – primarily the Defendant's lack of a criminal record, her cooperative behavior since this incident occurred, and her strong bond with her children and community – it was clear that the court had weighed all the evidence and concluded that the "disturbing" nature of this offense, coupled with a lack of remorse and strong need for deterrence, outweighed any evidence favoring judicial diversion.

With respect to the circumstances of the offense, the Defendant argues that the trial court relied too heavily on the nature of her relationship with the victim and failed to note that the victim was a *former* student of the Defendant, school had already ended by the time of the incident, and that the Defendant did not maintain an authoritative position over the victim while they both worked at the NASCAR Speedpark. She also explains that "off-duty acts that are unrelated to [the] defendant's duties of public employment are not a proper basis for . . . justifying a denial of [judicial] diversion." *State v. Lane*, 56 S.W.3d 20, 27 (Tenn. Crim. App. 2000). The Defendant further argues that there is no evidence in the record to prove that she and the victim had any kind of "inappropriate relationship" prior to the date that the incident occurred.

In addressing her lack of remorse, the Defendant argues that her psychosexual evaluation proves that she has taken full responsibility for her behavior and has acknowledged the harmful nature of sexual abuse. She states that the trial court improperly failed to consider that she sought counseling, which addressed, in part, "making mistakes and paying the consequences for poor judgment." The Defendant further claims that because this Court has stated that remorse per se is not an appropriate factor in denying judicial diversion, *see State v. Kristi Dance Oakes*, No. E2005-01668-CCA-R10-CD, 2006 WL 176550, at *3 (Tenn. Crim. App., at Knoxville, Jan. 23, 2006), the trial court erred in placing so much weight on this factor.

In addressing the deterrence issue, the Defendant argues that the trial court failed to consider the *Hooper* factors for deciding whether there is a need for deterrence and whether incarceration is the proper means to achieve that goal. In *Hooper*, the Court stated that "since the 'science' of deterrence is imprecise at best," trial courts should consider the following factors in weighing the deterrence issue:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole;

(2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior;

(3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;

(4) Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective;

(5) Whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or conviction.

*Hooper*, 29 S.W.3d at 10-12. The Court added, however, that "[t]hese factors are meant to serve only as a guide, and a court need not find that all these factors are present before ordering incarceration based on a need to deter similar crimes." *Id.* at 12. In the case under submission, there is evidence in the record that satisfies the first three *Hooper* factors – proof of other incidents in the community and state of statutory rape involving an adult female and teenage boy, the Defendant's statement that she knew what she was doing while committing the offense, and the negative media publicity that led to the Defendant's termination from her grocery store job.

The Defendant stresses that, because the State did not present any witnesses to testify regarding the need for deterrence, there was no basis for the trial court to rely so heavily on that factor. The Defendant further argues that the State's reliance on a newspaper article, a pending statutory rape indictment in Sevier County, and a letter from the Defendant's husband, is insufficient to prove that there is a serious societal problem with this type of sexual offense.

Upon review, we conclude that there is substantial evidence to support the trial court's conclusion that the circumstances of the offense, the Defendant's lack of remorse, and the need for deterrence warrant a denial of judicial diversion. As the victim's biology teacher, the Defendant held a position of public trust. The community expected her to serve as an educator and role model to her students. Even though the evidence shows that the Defendant and victim only once engaged in an illegal sexual act, their relationship was ongoing. The evidence shows that the Defendant engaged in late-night internet communications with the victim throughout the school year, went to work with the victim at the NASCAR Speedpark the following summer, and gave the victim rides to and from work on multiple occasions.

In our view, the Defendant's reliance on *State v. Lane,* to emphasize that she was "off-duty" when the incident occurred, is misplaced. *See Lane*, 56 S.W.3d at 26. Upon her arrest, the Defendant told Officer Wagers that she was the victim's biology teacher. Additionally, the trial court in this case stated that "[the] evidence shows, and common sense tells us, that the [teacher-student] relationship, once formed, is [always] the relationship between these two parties." We agree

10

with the trial court's assessment. In our view, a teacher can not be "off-duty" from her position as an authority figure and role model when she interacts with her students, regardless of whether the interaction is on school premises or not. In addition, teachers occupy a position of public trust, and society expects them to refrain from engaging in sexual activity with their students. *State v. Ronald Joseph Reece*, No. W2004-01130-CCA-R3-CD, 2005 WL 452451, at *5 (Tenn. Crim. App., at Jackson, Feb. 25, 2005). In the case under submission, the evidence in the record proves that the Defendant abused her position of public trust, and, thus, the circumstances of the offense weigh against her.

We also conclude that there is evidence of the Defendant's lack of remorse. Testimony from Patricia Fletcher, the victim's mother, revealed that, when the Defendant called her after the incident, the Defendant seemed more concerned about the fate of her teaching career than about the impact of the incident on the victim and his family. Also, Officer Wagers testified that, during the time immediately following her arrest, the Defendant maintained a positive and upbeat attitude and did not seem to be embarrassed by, or sorry for, what she had done. According to the Defendant's psychosexual evaluation, the Defendant only has a fair insight about what happened with the victim and the ramifications for her actions. Because the trial court looked at several other factors besides remorse in denying judicial diversion, the Defendant's contention that denial was based on remorse per se is invalid. Lack of remorse is an appropriate factor for a trial court to consider in deciding whether to grant judicial diversion. *See State v. Edward Arnold Rivera*, No. W2001-00857-CCA-R9-CD, 2002 WL 1482655, at *3 (Tenn. Crim. App., at Jackson, Feb. 4, 2002). Even though there is some evidence in the record indicating that the Defendant is sorry for what transpired, the trial court did not abuse its discretion by giving more weight to the evidence of lack of remorse.

With regard to deterrence, there is some aspect of general deterrence in every case, *see Hooper*, 29 S.W.3d at 10, and, in analyzing the weight that trial courts give to the deterrence issue, the Tennessee Supreme Court has stated:

> [W]e will presume that a trial court's decision to incarcerate a defendant based on a need for deterrence is correct so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

*Id.* We conclude that there is evidence in the record to support both of these elements. The State presented evidence regarding two similar cases – one in the same county as this case and one elsewhere in the state. Further, the newspaper article attached to the State's response to the Defendant's pretrial diversion application contains a general discussion about the prevalence of adult females engaging in sexual relations with teenage boys. Additionally, in the letter written by the Defendant's husband, he candidly stated that he has "been placed in situations, when [he] taught high school, where something of this nature could have happened; [likely] most teachers can say that if

11

they are honest." He also stated that this type of incident between a teacher and student is a "true problem" in society. All of this proof is sufficient to show that there is not only a need for community and statewide deterrence, but other similarly-situated individuals might be deterred from making the same mistakes as the Defendant if the Defendant were incarcerated. Thus, there is no basis for disturbing the trial court's assessment of deterrence in its decision to deny judicial diversion.

The Defendant claims that the trial court also failed to consider her "numerous positive character traits" in deciding whether to grant judicial diversion. We disagree. The trial court stated:

> [We have] considered . . . the testimony of witnesses; the evidence presented by way of statements, letters, exhibits; the Presentence Investigation Report; the psychosexual evaluation report; principles of sentencing; the nature of conduct as shown by the facts of the offense; the evidence of mitigating and enhancement factors as presented; statements and arguments of counsel; and the entire record in this cause.

We conclude that the trial court performed a thorough examination of all the evidence in this case, and the Defendant has not proven that the trial court abused its discretion when it denied her application for judicial diversion. Accordingly, the Defendant is not entitled to relief on this issue.

## B. Full Probation

The Defendant argues that the trial court erred in denying full probation because the State did not meet its burden to prove that confinement would be more suitable than the statutory presumption of alternative sentencing. When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, T.C.A. § 40-35-103, we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) any evidence received at the trial and/or sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the

offense, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf, and (8) the defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

To meet the burden of establishing suitability for full probation, a defendant must demonstrate that full probation will subserve the ends of justice and the best interests of both the public and the defendant. *State v. Blackhurst*, 70 S.W.3d 88, 97 (Tenn. 2001). The following criteria, while not controlling the discretion of the sentencing court, shall be accorded weight when deciding the defendant's suitability for full probation: (1) the nature and circumstances of the criminal conduct involved; (2) the defendant's potential or lack of potential for rehabilitation; (3) whether a sentence of full probation would unduly depreciate the seriousness of the offense; and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. T.C.A. §§ 40-35-103(1)(B), -103(5), -210(b)(4) (2006); *see also Blackhurst,* 70 S.W.3d at 97.

In this case, the Defendant is eligible for full probation because her sentence is ten years or less (subject to some statutory exclusions not relevant here). T.C.A. § 40-35-303(a). Although full probation must be automatically considered by the trial court as a sentencing alternative whenever the defendant is eligible, "the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b), Sentencing Comm'n Cmts.

The trial court considered the same general factors with respect to the Defendant's request for full probation as it did for her request for judicial diversion. The court found that the circumstances of the offense were particularly shocking, especially given the age difference between the Defendant and victim and the Defendant's role as the victim's teacher. Further, the court stated that "punishment is necessary to avoid depreciating the seriousness of this offense."

The Defendant claims that, pursuant to Tennessee Code Annotated section 40-35-102(6), the Defendant, as a Class E felon, "is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tennessee Code Annotated section 40-35-103(1) provides some guidance as to what constitutes "evidence to the contrary." It states that confinement is appropriate if: (1) it will "protect society by restraining a defendant who has a long history of criminal conduct;" (2) it will "avoid depreciating the seriousness of the offense or [will] provide an effective deterrence to others likely to commit similar offenses;" or (3) "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant." T.C.A. § 40-35-103(1)(A)-(c). The Defendant argues that the trial court did not find evidence to the contrary – in particular, that it did not find that confinement is necessary to protect society, that less restrictive measures have frequently or recently been applied unsuccessfully to the Defendant, or that the facts of the offense are especially shocking. Further, the Defendant asserts that the trial court's finding of a need for deterrence was based not on proof in the record but rather on a "mere conclusory opinion of the trial judge."

Upon review, we conclude that the trial court used sound reasoning when it chose to deny

full probation.  There is evidence in the record to prove that the circumstances of this offense are such that confinement is necessary to avoid depreciating the seriousness of the offense and that confinement will provide an effective deterrence to others likely to commit similar offenses.  *See, e.g.*, *State v. Davis*, 940 S.W.2d 558, 560 (Tenn. 1997).

We must, however, modify the terms of the sentence to thirty percent of eighteen months, which is 162 days (down from 180 days).  *State v. Sutton* mandates such a reduction.  166 S.W.3d 686, 691 (Tenn. 2005) (analyzing Tennessee Code Annotated section 40-35-501(a)(3) and concluding that defendants with sentences less than two years "have more than a mere hope of release . . . upon reaching their release eligibility date;" thus, split confinement sentences cannot require service of more time than what would be required under the release eligibility date.); *see State v. David Wayne Fountain*, No. E2004-01226-CCA-R3-CD, 2005 WL 1528244, at *4 (Tenn. Crim. App., at Knoxville, June 28, 2005).

### C. Community Supervision for Life

Both parties agree that the trial court incorrectly sentenced the Defendant to community supervision for life following the expiration of her eighteen-month sentence, pursuant to Tennessee Code Annotated section 39-13-524.  Statutory rape is not one of the offenses triggering application of this statutory requirement.[6]  The State acknowledges that "the judgment form is deficient because the box indicating that the [D]efendant . . . be placed on community supervision for life is incorrectly checked."  As such, this clerical error should be corrected on remand through an amended judgment.  In Tennessee, courts may "correct mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission."  Tenn. R. Crim. P. 36.  In addition, the Tennessee Supreme Court has determined that a trial court has the authority to "correct an illegal . . . sentence at any time, even if it has become final."  *State v. Burkhart*, 566 S.W.2d 871, 873 (Tenn. 1978).  Accordingly, we remand for the trial court to amend the judgment form to reflect the proper sentence.

### III.  Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgment of the trial court sentencing the Defendant to eighteen months, however we modify the time to be served in jail from 180 days to 162 days.  We remand for the entry by the trial court of an amended judgment form to reflect that the Defendant is not to be placed on community supervision for life and for the appropriate sentence reduction.

_____
ROBERT W. WEDEMEYER, JUDGE

---

[6] Tennessee Code Annotated section 39-13-524 mandates that those convicted of aggravated rape, rape, aggravated sexual battery, or rape of a child, be sentenced to community supervision for life.  T.C.A. § 39-13-524 (2006); *see* T.C.A. §§ 39-13-502, -503, -504, -522.